### In re GALLAND.

(Supreme Court, Appellate Division, First Department.   May 5, 1916.)

ATTORNEY AND CLIENT ☞58—CENSURE OF ATTORNEY—GROUNDS—ABUSE OF PROFESSIONAL COURTESY.

It is a breach of the standard of fair dealing and straightforward conduct, required of attorneys in their professional relations with each other, for an attorney for judgment debtors, during the time the judgment creditor is withholding execution, as a favor to the former and at his request, to aid in changing the financial status of the judgment debtors by drawing a chattel mortgage on an automobile, which was their only asset not exempt, and preparing voluntary petitions in bankruptcy and an order restraining the issuance of execution, to be used in case the judgment creditor did not compromise the judgment; but where such acts were not for the attorney's own gain or profit, but solely occasioned by a mistaken idea of his duty to his clients, and the attorney was of good character and standing, a censure for his abuse of the professional courtesy is all the punishment required.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 76–78; Dec. Dig. ☞58.]

Charges against Justin S. Galland, an attorney and counselor at law, for professional misconduct.   Respondent censured.

Argued before CLARKE, P. J., and McLAUGHLIN, LAUGHLIN, SMITH, and PAGE, JJ.

Einar Chrystie, of New York City (Keyes Winter, of New York City, of counsel), for petitioner.

S. Stanwood Menken, of New York City, for respondent.

CLARKE, P. J.   This is the usual proceeding instituted by the Association of the Bar of the City of New York, charging the respondent with misconduct in his office as an attorney at law; the specification being as follows:

On December 15, 1914, Jason Neilson recovered a verdict of $500 against Joseph Freedman and Max Freedman for damages for per-

sonal injuries received by being struck by an automobile, and judgment on the verdict was entered the same day. The respondent, as attorney for the Freedmans, moved to set aside the verdict and for a new trial, and on January 18, 1915, that motion was denied. On that day Philip V. Manning, an attorney associated with the attorneys for Neilson, notified the respondent of the decision, and the respondent asked Manning to withhold the issuance of execution until the respondent found out what his clients wanted to do, and pursuant to that request Manning did not issue execution. On January 20, 1915, Manning again spoke to the respondent and asked him what he proposed to do about paying the judgment, and the respondent again requested Manning to withhold issuance of execution. Later in that day the respondent called at the office of Neilson's attorneys and offered $100 in settlement of the judgment, which offer was refused. On the morning of January 21, 1915, the respondent filed voluntary petitions in bankruptcy in behalf of both Freedmans in the United States District Court for the Southern District of New York, which petitions were prepared by the respondent and verified January 19, 1915, which was the day before he had made the second request of Manning not to issue execution. On January 19, 1915, two days before the filing of the bankruptcy petitions, Joseph Freedman executed in favor of a brother-in-law a chattel mortgage on the automobile for $300, which mortgage was prepared by the respondent and was duly filed in the office of the register of Kings county. The automobile was the only asset mentioned in Joseph Freedman's bankruptcy petition, except some exempt wearing apparel, and the judgment obtained by Neilson was the only liability. The respondent, in his conversation with Manning on January 20, 1915, did not inform Manning of the chattel mortgage or of the bankruptcy petitions. On the day the bankruptcy petitions were filed respondent obtained from the United States District Court orders restraining Neilson's attorneys from proceeding on the judgment. The respondent claims that Joseph Freedman borrowed $300 on the automobile from the brother-in-law at the time he executed the chattel mortgage, and the respondent admits he received $200 of this amount for his fees, and claims that Freedman kept the remainder.

The learned official referee states in his report as follows:

"The respondent testified, and I believe truthfully: That upon learning of the denial of the motion for a new trial on January 18, 1915, he telephoned to his client, advising him of the decision and instructing him to prepare to pay the judgment. That Mr. Freedman's reply was that he had no money with which to pay the judgment, that the only property he possessed was the automobile, whereupon the respondent suggested that he endeavor to borrow the money, or mortgage or sell the automobile, asked whether there was not some friend or relative who might advance sufficient money with which to pay the judgment, and suggested that he make every endeavor to raise the money and let him know as soon as he had obtained it. That the next day Mr. Freedman told him that he had obtained a loan of $300 on the automobile, and respondent drew the chattel mortgage at his request. Fearing the plaintiff would refuse to accept anything less than the whole amount of the judgment, and also apprehensive that body executions might issue, petitions in bankruptcy and the restraining order were prepared for use solely in case plaintiff refused to accept a compromise and should have body

executions issued. That defendants promised to see if they could not raise more money before an offer of settlement should be made, and before they had so further advised him Mr. Manning called him up on January 20th, as referred to above. That on that afternoon the defendants called at the respondent's office and advised him that they could raise no further money, and insisted that he should offer $150 in settlement. That he called at Mr. Manning's office, and after waiting for him from 3 to half past 3 he saw Mr. Sparks, one of the plaintiff's attorneys, and offered him first $100 and then $150 in settlement. That Mr. Sparks refused to consider accepting such amount in settlement. Thereupon, on the following day, he filed the peti-·tions in bankruptcy and obtaining the restraining order prepared two days before."

Respondent urges that the acts and omissions with which he is charged in this affair fail to show the slightest infraction of professional propriety; that he acted throughout in good faith and in the discharge of his duties as a lawyer as he understood them, with no thought or expectation of personal benefit or profit whatsoever, and solely with the purpose of getting together as much money as possible in order to settle the judgment; and that at no time was he a party to any scheme to change the status quo or financial condition of his clients, except for the better and for the ultimate benefit of the judgment creditor. The learned referee has found:

"In response to this claim it must be said that the acts of the respondent in becoming a party to so materially changing the status quo of his clients' situation, while negotiations for settlement were pending, were a violation of good ethics in the profession and cannot be excused by the explanation, however truthful, that no wrongdoing was intended, and I find the charge sustained."

It seems to be quite clear from the evidence that the value of this secondhand automobile was only about $200, and that the $300 which was obtained upon the security of the chattel mortgage thereon from Freedman's brother-in-law was obtained for the purpose of being applied to the settlement of the judgment which had been obtained by Neilson against the Freedmans. But it seems equally clear that the preparation of the petition in bankruptcy prior to the time of the failure of the negotiations for a settlement, and while the attorney for the plaintiff, upon the request of the respondent, was withholding the issuance of an execution on the judgment was a step taken in anticipation of the failure to obtain a settlement at the amount authorized by the Freedmans.

We agree with the learned official referee that it is not in accord with the standard of the fair dealing and straightforward conduct required of members of the profession in their professional relations with each other to take advantage of a favor extended by way of withholding process during negotiations for a settlement to actively aid in changing the financial status or condition of the client, so as to make process ineffectual upon the breaking off of the negotiations. We do not think in the matter at bar, however, that respondent was actuated by an evil design, or for his own personal gain or profit, but rather that he acted upon a mistaken notion of his duty to his clients. His previous character and standing are such that we are of the opinion that the ends of justice will be entirely satisfied by the administra-

tion of a censure for his abuse of the professional courtesy of withholding of process pending negotiations by active participation in changing the existing financial conditions of his clients. Settle order on notice. All concur.